## San Antonio & Aransas Pass Railway Company v. Southwestern Telegraph and Telephone Company.

No. 855. Decided February 8, 1900.

**1. Eminent Domain—Telegraph and Telephone Lines.**

The statutes conferring power to condemn land upon telegraph companies (Revised Statutes, articles 698, 699) apply to telephone companies and authorize a like procedure by them. (P. 318.)

**2. Same—Telegraph Includes Telephone.**

The phrases "magnetic telegraph lines" and "any telegraph lines," in Revised Statutes, articles 698, 699, are broad enough to include telephone lines,—the latter being but another method of accomplishing the one purpose,—transmission of messages by electricity. (Pp. 318-320.)

**3. Same—Statutory Construction.**

Though the telephone, being then newly invented and not in common use, was not contemplated by the Legislature when articles 698 and 699 authorizing condemnation by telegraph companies (incorporated under article 566) were enacted, the amendment of article 566, in 1891, which authorized incorporation for the con-

struction and maintenance of a "telegraph and telephone line," instead of "a telegraph or a telephone line," as in the amendment of 1885, was a legislative recognition of their substantial identity. (P. 320.)

### 4. Statutory Construction—Amendment—Change of Language.

An amendment changing the language of the law in a material respect is held to show any intent to change the law. (P. 321.)

### 5. Eminent Domain—Foreign Corporation.

The power to enjoy all the privileges conferred by the laws of the State on domestic corporations, given, by article 745, Revised Statutes, to foreign corporations obtaining permit to do business in this State, embraces the right possessed by a similar domestic corporation to exercise eminent domain. (P. 322.)

QUESTIONS CERTIFIED from the Court of Civil Appeals for the Third District, in an appeal from Falls County.

*Baker & Ross* and *Robson & Duncan,* for appellant.—The State does not part with the right of eminent domain without express words. 4 Thomp. on Corp., sec. 5584. It is a franchise which proceeds from the State and can not be exercised unless explicitly conferred by the State. Same authority. The power to condemn private property must be given or conferred in express terms. The taking of private property against the will of the owner being in derogation of the property rights of the citizen, the authority to take it must not be implied nor inferred, but must be given in express language. 7 Enc. of Pl. and Prac., 468; Schmidt v. Dinsmore, 42 Mo., 225; Railway v. Chicago, 138 Ill., 453; Cogswell v. Railway, 103 N. Y., 10.

The right of eminent domain must be conferred by the Legislature. It can not be conferred either directly or indirectly by the judiciary or executive. The courts can not, by judicial interpretation or construction, confer the right of eminent domain. When it is not expressly conferred by the Legislature the right does not exist.

A telephone can not become a telegraph because intelligence is transmitted over it. The one transmits verbal messages, and the other transmits written messages. To send a message over one it is only necessary that you are able to talk. Over the other to send a message you must be skilled and educated for that particular purpose.

It is evident that if a corporation created for the purpose of carrying on a telephone business in this State has the right to condemn, it must acquire the same under and by virtue of articles 698 and 699 of the Revised Statutes.

The magnetic telegraph was invented by Morse in 1837. It is an instrument which transmits messages by sounds of instruments and by signs of writing. The telephone was first made known by the inventor, Alexander Graham Bell, in 1876, and it is an instrument for electrically transmitting or receiving articulate speech. Articles 698 and 699 were enacted five years before the telephone was made known to the world. Now, the question to be determined by the court is, what was the intention of the Legislature in 1871 in regard to articles 698 and 699, when the same were enacted? Did thy intend at that time

to extend the right of eminent domain to magnetic telegraph corporations, and also to corporations which might be afterwards organized for the purpose of erecting telephone lines—an institution and an invention which was then unknown to the legislative mind when it was called upon to act?

The power must be given in express terms. The taking of private property against the will of the owner, being in derogation of the property rights of the citizens, must not be implied nor inferred, but must be given in express language. If there remains a doubt of the power or the extent of the power after reasonable intendments in its favor, such doubt shall be resolved adversely to the right. 7 Am. and Eng. Enc. of Pl. and Prac., 467, 468; Moody v. Railway, 20 Fla., 597; 14 Am. and Eng. Enc. of Law, title "Eminent Domain."

When our laws were codified in 1879 the telephone was then in its infancy, and we find upon examination of the Code of 1879 that our laws relating to private corporations granted no authority for the creation of corporations to carry on and maintain a telephone line or a telephone business. It was not until 1889 that the law was amended so as to authorize the creation of corporations to "construct telegraph or telephone lines." 19th Leg., p. 57. In 1891 this section was so amended as to read "to construct telegraph and telephone lines." The only change was the substitution of the conjunction "and" for the disjunctive conjunction "or." If the Legislature regarded the telephone as being the same as a telegraph, then why did they change the law to make it read so as to authorize the creation of corporations to carry on and to construct "telegraph and telephones?"

Again, in the Acts of 1889, providing for taxation an occupation tax was levied upon every chartered telegraph company doing business in the State of Texas of one cent for every full rate message sent by one person in the State to another person in the State." In the same act, but in a different section, telephone companies were required to pay an occupation tax of $50 for State taxes, and $5 to each county through which their lines ran. Sayles' Stats. 1888, 1889, p. 242. Also there was a tax of 25 cents levied upon each telephone instrument and no such tax was levied upon the telegraph instruments. See Acts of 1893, p. 156.

These agencies are covered by different patents. Again, the act of Congress in levying a war tax makes the telephone company pay the tax on a message, and on telegraph messages makes the sender pay it. This fact conclusively establishes the proposition that neither the legislative department of the Federal government nor that of the State government have ever regarded the telegraph and the telephone as one and the same. We are reinforced in this belief by the Supreme Court of the United States in the case of the City of Richmond v. The Southern Bell Telephone and Telegraph Co.

There is enough in the certificate to indicate that the appellee is a foreign corporation, and while the question is not directly certified, we

think the proposition is fundamental and germane to the question before the court. It is suggested that title 21, with the exception of chapter 17, relates to domestic corporations. That all the rights extended to corporations by this title are extended to domestic corporations and no others.

We think this is clearly the legislative intent, because there is a special chapter devoted to foreign corporations, and that chapter sets forth what steps foreign corporations have to take in order to do business and solicit business in this State. It provides that "hereafter any corporation for pecuniary profit, etc., organized or created under the laws of any other State or of any territory of the United States, or of any municipality of such State or territory or of any foreign government, sovereignty, or municipality, desiring to transact business in this State, or solicit business in this State, or establish a general office in this State, shall be required to file a certified copy of their charter with the Secretary of State, who shall thereupon issue to such corporations a permit to·transact business in this State." This is a special grant of a franchise, made upon certain specific conditions. Franchises are to be strictly construed. Grants of them will not embrace more than are specially designated, and this Statute only grants to foreign corporations who have complied with the prescribed conditions the right to transact or solicit business or establish a general or special office.

The right to exercise the power of eminent domain is not a "business" in contemplation of law, and it is not conferred under the grant of power to establish an office to do and solicit business. The right of eminent domain is itself a franchise, very distinct from a general right to do business or solicit business. And in order to be exercised, it must be ·explicitly granted. It can not be inferred or implied. Therefore, if the Legislature has separated foreign and domestic corporations, and has devoted a certain chapter to the former, in which their rights and privileges are distinctly set forth, then the foreign corporation has no other power in this State except such as is given to it by the statute. They have no power to take to themselves the rights conferred on domestic corporations unless expressly granted. This proposition is sustained by 4 Thomp. on Corp., sec. 5346; vol. 6, sec. 7932; Cable Co. v. Railway, 94 Fed. Rep., 234; Mills on Em. Dom., sec. 352; 1 Wood on Railway Law., 36, 37.

We have suggested the question of the rights of foreign corporations, at the request and instance of the Attorney-General.

*McLaurin & Wozencraft*, for appellee.—The statutes of Texas do not confer upon telegraph companies. eo nomine, the right to exercise the power of eminent domain, but grant this right generally to all "corporations created for the purpose of constructing and maintaining magnetic telegraph lines." Rev. Stats., arts. 698, 699.

Appellee as a corporation chartered, and holding a permit from the

State of Texas, to serve the public in the transmission of intelligence between places at great distances from each other, such service being conducted by the use of such poles as are ordinarily used for what are commonly called telegraph lines, supporting such wires and acted upon by electricity as in the case of like service over such telegraph lines, is embraced in that class of corporations referred to in those Texas statutes, which confer the right of eminent domain upon "corporations created for the purpose of constructing and maintaining magnetic telegraph lines." Rev. Stats., arts. 342, 698, 699; Railway v. Telegraph and Telephone Co., 45 S. W. Rep., 151; Telegraph and Telephone Co. v. Railway, 52 S. W. Rep., 107; Telegraph and Telephone Co. v. Forke, 2 Willson C. C., sec. 367; Dolbear v. Telephone Co., 126 U. S., 1; Duke v. Telephone Co., 53 N. J., 341; Telephone Co. v. Oshkosh, 62 Wis., 32; Attorney-General v. Edison Telephone Co. 6 Q. B. Div., 244; Telephone Co. v. Telegraph Co., 7 Atl. Rep., 809; Telephone Co. v. Board, etc., 67 Iowa, 250; Roberts v. Telephone Co., 46 N. W. Rep., 800; Telegraph and Telephone Co. v. Electric Railway Co., 42 Fed. Rep., 273; Telephone Co. v. Railway, 135 N. Y., 394; Franklin v. Telephone Co., 69 Iowa, 97; Telephone Co. v. Telegraph Co., 2 Electrical Cases, 407; Commonwealth v. Telephone Co., 42 Leg. Intel., 180; Telephone Co. v. Railway, 11 Pa. Co. Ct. Rep., 417; Thompson on Electricity, sec. 101; Croswell on Electricity, sec. 13.

The right of eminent domain need not be expressly given, provided the power arises by necessary implication from the language of the grant, such construction being placed upon the grant as the circumstances of the case suggest was designed by the Legislature. Forshey v. Railway, 16 Texas, 527; Laughter v. Seela, 59 Texas, 186; Irrigation Co. v. Hudson, 85 Texas, 592; Cayce v. Curtis, Dallam, 404; Overstreet v. Manning, 67 Texas, 663; Cain v. State, 20 Texas, 362; Black Interp. Law, 303 and 161; Potter's Dwar. on Stats., 274, note 4; Suth. Stat. Const., sec. 255.

BROWN, ASSOCIATE JUSTICE.—The Court of Civil Appeals for the Third Supreme Judicial District has certified to this court the following statement and questions:

"The appellee is authorized to do business in Texas as a telegraph and telephone company, and is putting in operation a long distance telephone system to and from different towns in the State of Texas. The appellee brought this action to have condemned certain portions of the right of way adjoining the appellant's railway line, for the purpose of planting and erecting its telephone poles, upon which, it appears from the evidence, they propose to place telephone wires for the purpose of operating a long distance telephone system. Electricity is an agent used in the operation of both long distance telephone and electric telegraph lines.

"In connection with the above facts, we certify to the Supreme Court, for its answer, the following questions:

"First. Do the statutes that relate to the exercise of the right of eminent domain in condemnation proceedings conferred upon telegraph companies apply to telephone companies and authorize a like procedure by telephone companies?

"Second. If the above question is answered in the negative, then did the appellee have the right to institute and maintain the condemnation proceedings in question, by reason of the fact that it was also authorized to construct telegraph lines, as well as telephone lines; and in this connection, it is well to state that we find that the line sought to be established and erected upon the appellant's right of way by the appellee was to be used as a long distance telephone line."

To the first question, we answer, yes.

The following articles of the Revised Statutes were enacted by the Legislature in the year 1871:

"Article 698. Corporations created for the purpose of constructing and maintaining magnetic telegraph lines are authorized to set their poles, piers, abutments, wires, and other fixtures along, upon, and across any of the public roads, streets, and waters of this State, in such manner as not to incommode the public in the use of such road, streets, and waters.

"Article 699. Such companies are also authorized to enter upon any lands, whether owned by private persons in fee or in any less estate, or by any corporation, whether acquired by purchase or by virtue of any provision in the charter of such corporation, for the purpose of making preliminary surveys and examinations with a view to the erection of any telegraph lines, and from time to time to appropriate so much of said lands as may be necessary to erect such poles, piers, abutments, wires, and other necessary fixtures for a magnetic telegraph, and to make such changes of location of any part of said lines as may from time to time be deemed necessary, and shall have a right of access to construct said line, and, when erected, from time to time, as may be required, to repair the same, and may proceed to obtain the right of way and to condemn lands for the use of the corporation in the manner provided by law in the case of railway corporations."

At that time, telephones had been recently invented and were not generally known, and it can not be supposed that the Legislature had telephones in mind when it used the word "telegraph;" however, the fact that the telephone was not then in contemplation of the Legislature does not control the construction of article 641, subdivision 8, for, if the language used is broad enough to embrace a subsequently developed method, the later invention might be controlled by the pre-existing law as if it had been in existence at the time the law was made. Attorney-General v. Edison Telephone Co. of London, 6 Q. B. Div., 254, 255.

The term "telegraph" has been held in the following cases to include telephones: Franklin v. N. W. Tel. Co., 69 Iowa, 97; The Iowa Tel. Co. v. The Board of Equalization, 67 Iowa, 250; Wisconsin Tel. Co.

v. Oshkosh, 62 Wis., 32; Duke v. Central N. J. Tel. Co., 53 N. J. L., 341; Attorney-General v. Edison Tel. Co., 6 Q. B. Div., 244; N. W. Tel. Exch. Co. v. Chicago, M. & St. P. Ry. Co. (Minn.), 79 N. W. Rep., 315. Each of the cases hold that the word "telegraph" when used in a statute includes the telephone, but the two cases of Attorney-General v. Edison Telephone Company of London and Duke v. The Central New Jersey Telephone Company are the most directly in point.

The former case was based upon this state of facts: In England there were statutes providing that "the postmaster-general is to have the exclusive privilege of transmitting messages or other communications by any wire and apparatus connected therewith used for telegraphic communication or by any other apparatus for transmitting messages or other communications by means of electrical signals." Attorney-General v. Edison Telephone Co., cited above. In that case the court said: "The result of the definition seems to be that any apparatus for transmitting messages by electric signals is a telegraph, whether a wire is used or not, and that any apparatus of which a wire used for telegraphic communication is an essential part is a telegraph, whether communication is made by electricity or not." The telephone company was organized to operate a telephone system in the city of London, and, under the law previously cited, the attorney-general brought an action claiming that it was in violation of the statute of that kingdom, and the question turned upon whether or not the telephone was within the meaning of the act in relation to the telegraph. The court held the telephone to be embraced in the law. That case was very similar in its nature to this; the government was exercising its sovereign power in controlling and appropriating to itself the property of the citizen—the telephone—or, at least, the use of it, as is done in the case of eminent domain where the right of way is taken for the use of the government or by its authority for public use by a corporation or natural person. The same rules of construction, therefore, we think would apply in this case as in that. Upon a very elaborate discussion and philosophical examination of the question, the court held that the term "telegraph" was "wide" enough to include the telephone, and the government was entitled to control its operation within that kingdom.

In Duke v. Central New Jersey Telephone Company, before cited, the telephone company was organized under the general law of the State of New Jersey which authorized the organization of telegraph companies but did not specifically authorize the organization of telephone companies. The company undertook to construct its line and to condemn the right of way therefor. The question arose as to the validity of its incorporation and its right to condemn property. The court, in that case, held that the term "telegraph" as used in the statute, included "telephone," and that the charter granted to a telephone company, under the general law, authorizing the incorporation of telegraph companies, was valid. A statute of that State making the laws regarding "tel-

egraphs" applicable to "telephones" was invoked, but, its validity being questioned, the court disregarded it, and put the decision squarely upon the provisions of the law concerning "telegraph" companies.

Counsel for appellant claim that the Supreme Court of the United States decided, in the case of City of Richmond v. Telephone Company, 174 U. S., 761, that "telephone" was not embraced in the word "telegraph," and that a telephone company was not entitled to the privileges granted by the Act of Congress of 1866, which granted certain privileges to telegraph companies. It is true the court so held, but it was not upon the construction of the words "telegraph" and "telephone," but upon the conclusion reached, that, under the then existing circumstances, Congress did not have in mind the telephone when it enacted the law granting the privilege to telegraph companies, for the reason that at the time the act was passed, telephones were not known to the members of the national legislature. The opinion of the court is, however, pregnant with the thought that if the telephone had then been in common use, the decision might have been different. However that may be, we do not consider that case applicable here.

Upon good authority and sound reasoning, we can safely say that the phrases "magnetic telegraph lines" and "any telegraph lines," found in articles 698 and 699, Revised Statutes, are broad enough to include the "telephone," if the Legislature so intended in the enactment of the statute now in force, authorizing the creation of "telegraph and telephone" corporations. Inquiry is not directed to the intent of the Legislature when articles 698 and 699 were first enacted, but we seek the legislative intent in the year 1891, when the law concerning private corporations was amended by the present provision.

A brief history of legislation upon this subject will aid us in construing the statute now in force. Articles 698 and 699, which grant to telegraph companies the right to condemn right of way for erecting their lines, etc., were enacted as sections 53 and 54 of the general incorporation law first passed at the session of 1871, and afterwards reenacted in the year 1874. The fifth subdivision of section 566 of the original act provided that a corporation might be formed for "the construction and maintenance of a telegraph line," no mention being made of the telephone. Articles 698 and 699 have remained in force since their enactment as parts of the general incorporation law, and the provision for incorporating a telegraph company, before quoted, continued until the year 1885, when it was amended so as to read, "the construction and maintenance of a telegraph or a telephone line," in which form it continued until the year 1891. It will be observed that in the act last quoted, "telegraph" and "telephone" are not only used disjunctively, but the article "a" is so placed before each as to show distinctly the intent to separate them and to authorize the construction of one or the other,—not both. In the year 1891, the Legislature amended article 566 of the Revised Statutes, and, in the eighth subdivision, author-

ized the creation of a corporation for "the construction and maintenance of a telegraph and telephone line," which is the law in force at this time.

The change in the form of expression is so marked as to indicate with certainty a change in the policy of the Legislature with reference to telegraph and telephone lines. A change of language in a material respect is held to show an intent to change the meaning of the law. James v. Patten, 6 N. Y., 9; Lehman v. Robinson, 59 Ala., 240; Rich v. Keyser, 54 Pa. St., 89. Between the enactment of the first statute upon the subject and the one last cited a period of twenty years elapsed, during which time great progress was made in scientific development in both telegraphing and telephoning. During this period of time, many of the courts of the land determined, in accordance with scientific opinion on the subject, that the word "telegraph" is a comprehensive term which includes the telephone system. We can see in the changes of the law what progress had been made in the public mind as reflected in these various statutes. At first, the telephone was not mentioned; then the expression was such as to show that the relation between the telegraph and the telephone was not appreciated, perhaps not comprehended at that time by the legislators, and finally that body gave expression to the conclusion reached by the courts that the broader term, "telegraph," includes "telephone," as a method of communication by means of electricity, and, in order to faciliate the construction and use of these aids, we might say necessities, to the business and convenience of the public, the law was so changed that "a telegraph and telephone line" might be constructed and operated, using the one or the other, or both, under the same charter provisions.

The change in the law of 1885 by the amendment of 1891 consists in substituting the copulative conjunction "and" for the disjunctive "or" and in omitting the article "a" after the conjunction; by this change of the sentence, the meaning of the law is manifestly changed so that the words "telegraph" and "telephone," as adjectives, are applied to the one object "line." The structure of this sentence indicates that the Legislature understood that "telegraph" and "telephone" were closely related in meaning, and, in fact, so consistent with each other that the two words were used to express different modes of accomplishing the one purpose,—the transmission of messages by means of electricity.

As the law now stands, it must be construed either to authorize and require of the incorporated company to construct both a telegraph and a telephone system upon one line or that they are expressions of different methods of carrying out the common purpose of telegraphing; that is, that the telegraph includes the telephone system. If we place the former construction upon the sentence, holding that "a telegraph" and "a telephone" are different, when a company organized to construct "a telegraph and telephone line" shall undertake to secure right of way,

it can condemn for the use of telegraphic purposes alone, and, being bound, if it erects a telegraph line, to also construct a telephone, the corporation would be without power to use the right of way for the telephone line, because, under that construction, the authority to condemn would be restricted to the "telegraph," and the erection of the telephone upon right of way condemned for a telegraph line would be an additional burden not authorized by law, and the corporation would be without power to acquire right of way for a telephone, without which it could not conduct its business. This would be an absurd consequence which shows the construction not to be legitimate. The interpretation which confers upon telephone corporations the rights granted to telegraph corporations harmonizes every provision of the law upon the subject of telegraph and telephone, and is consistent with the well known history of the times in which these statutory provisions were evolved.

We conclude, that, when the Legislature of 1891 enacted the law in its present form, it intended to express that "telephone" was within the broad meaning of "telegraph," and that corporations formed under subdivision 8 of article 641, Revised Statutes, are "created for the purpose of constructing and maintaining magnetic telegraph lines," and are authorized by article 699 to condemn right of way for their lines.

Article 745, Revised Statutes, requires foreign corporations to procure permits to do business in this State, prescribing what they must do to procure the permits, and, with reference to such as may comply, enacts, "such corporations, on obtaining such permits, shall have and enjoy all of the privileges conferred by the laws of this State on corporations organized under the laws of this State." Thus the State adopts the foreign corporation upon the terms stated in the law and makes it equal to domestic corporations. Language could not be more comprehensive and is ample to embrace the right of condemnation. It would be a mockery to give the corporation permission to construct and maintain "a telegraph and telephone line" and, at the same time, deny to it the use of the only means by which it could exercise the privilege granted.